**In re Larry W. DENT, Respondent.**

**No. 58235.**

Supreme Court of Missouri,
En Banc.

Dec. 16, 1974.

Robert C. Jones, Clayton, for informants.

Daniel V. O'Brien, St. Louis, for respondent.

SEILER, Judge.

The 21st Judicial Circuit bar committee filed charges against Larry W. Dent, a member of the Missouri Bar, alleging that Dent had violated rule 4.47 of the Canons of Ethics as they were then in force.[1] The charges against Dent were as follows:

"That during June of 1968 and thereafter you met with one William H. Marx, a contractor in St. Louis County, Missouri, on numerous occasions and that during the course of such meetings you solicited from him large sums of money for the express purpose of influencing one or more public officials of the City of Bridgeton, Missouri, to provide William H. Marx with various permits required by him in connection with a building project in said city; and that you received from him a portion of such amounts for the purpose indicated and in so doing you failed to maintain your integrity as a lawyer, you willfully committed an act or acts against the interest of the public and that you became guilty of misconduct against the laws of Missouri and should no longer be entrusted with the duties and responsibilities belonging to the office of an attorney, all in violation of Rules of the Supreme Court of Missouri, to-wit:

Canons of Ethics Rule 4.47.

"It is further charged that your aforementioned conduct is in violation of the newly adopted Rule 4, Code of Professional Responsibility, Supreme Court of Missouri, Canon 1–102(A), requiring that a lawyer shall not '(4) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.'"

Hearings were held before the bar committee followed by formal accusations against Mr. Dent as set forth above, followed by further hearings before Honorable Arthur W. Rogers, Judge of the Eighth Judicial Circuit, Special Commissioner appointed by this court to hear and report on the matter.[2] Mr. Dent denied the charges.

Judge Rogers came to the conclusion that Mr. Dent had violated rule 4.47 and Canon 1, DR 1–102(A)(4) in certain particulars and recommended that temporary measures should be taken in the way of

1. The acts were alleged to have occurred in 1968. Former rule 4, consisting of 4.01 to 4.47 was repealed by order of this court dated November 4, 1970 and a new rule 4, Code of Professional Responsibility, V.A.M.R., adopted in place thereof, effective January 1, 1971. Former rule 4.47 applied, and the new rule 4,

Canon 1, DR 1–102(A)(4) applies, to conduct involving dishonesty, fraud, deceit or misrepresentation.

2. There are over 1700 pages of testimony and 82 exhibits.

discipline without making any specific recommendation.

While there were other witnesses, the evidence comes mainly from one William H. Marx on the one hand and respondent Larry W. Dent on the other. Marx was a professional civil engineer and developer of an industrial park called Rock Industrial Park, consisting of 130 acres located in the municipality of Bridgeton in St. Louis County. The tract was in the flood plain of the Missouri River, abutted by St. Charles Rock Road on the south. A point on this road is 451 feet above sea level and is considered above the flood plain of the Missouri River. Portions of the tract acquired by Mr. Marx for industrial park development, however, were as much as seven feet below the 451 foot point, which created development problems relative to flood control facilities, disposition of sewage, street construction, elevations and maintenance and access for emergency vehicles in time of high water.

Mr. Marx encountered difficulties, objections, and requirements to be met in obtaining approval by the city council of Bridgeton of his proposed subdivision and sewer plans and in obtaining building permits for industrial construction in the subdivision.

Rightly or wrongly, Mr. Marx reached the conclusion that payoffs were required to get things done in Bridgeton. He so stated to numerous persons, one of whom suggested that he employ respondent. Respondent at the time had been out of law school six or seven months and was practicing in Manchester, Missouri, and was also mayor of that city. Marx had been informed that respondent and Earl Davis, also a lawyer and at the time mayor of Bridgeton, were friends and had been in law school together.

Marx first met Dent on Saturday, June 15, 1968 at Dent's law offices. Marx related his subdivision development problems and told Dent he wanted to learn "what it takes to get the job done in Bridgeton". Marx was looking for someone who could arrange and effect the payment of bribes or a bribe.[3]

Dent agreed to meet with Mayor Davis and report to Marx. This he did within a day or so. Dent reported that Mayor Davis told him it would cost Marx $1,000 per acre to complete Rock Industrial Park. Dent insisted at the hearings that this money was to be deposited to guarantee that the requirements of the city in connection with development of the subdivision would be met. Marx insisted he was to pay this amount for approval of his plat and the issuance of the permits. He testified that he treated the demand as preposterous, but did say that something in the neighborhood of $500.00 per acre might be feasible. Dent, he said, responded he would see Davis and return. He returned, Marx said, with word that $65,000 was satisfactory.

According to Marx, Dent proposed as a means of payment an arrangement whereby Marx (meaning his corporation, Rock Industrial Park, Inc., which was the record owner of the real estate) would give a corporation to be organized by Dent, Dent Investments, Inc., an irrevocable option good for two years on three of the choice lots in the proposed subdivision, together with a contract for sale of the lots to Dent's corporation at a specified price, upon exercise of the option. At the same time, Dent's corporation would give an option to Marx (actually to two of Marx' other corporations, R.C.A. Realty Company and Oklahoma Corporation) also irrevocable for a period of two years, on the same lots, with a similar contract of sale, also at a speci-

---

3. Ultimately, Marx surrendered his seal and license as a professional engineer for a period of six months as the result of a proceeding initiated by the State Board of Architects, Professional Engineers and Land Surveyors on a charge which recited, according to Marx, that "I was involved in a bribery or extortion within the city of Bridgeton in 1968."

# 74

fied price, upon exercise of the option. The price in the first contract was $92,000 and in the second, $155,000, a difference of $63,000. According to Marx, there was no intention of any cash transfer on either side until the time of the repurchase. In return for executing these options, Marx was to receive plat approval and the various building permits.

Dent organized Dent Investments, Inc., on June 19, 1968. He was the sole shareholder and director. The certificate of incorporation was issued June 21, 1968. The option-sales contract agreements were executed and delivered July 26, 1968. The plat was approved August 21, 1968, but the building permits were yet to be issued.

According to Dent, the option-sales contract agreements were his brain-child, a "novel" means of providing security for the city of Bridgeton, which would, if accepted by the city, enable Marx to avoid putting up a much higher guarantee or bond which he was not financially able to provide and at the same time, permit him to develop his subdivision on a "segmented" basis, a little at a time; that $65,000 was set by Marx as the amount needed to guarantee completion of improvements for the first segment.

On or about August 28, 1968, Dent told Marx the option-sales contract agreements plan would have to be abandoned, that Mayor Davis considered it impractical, that it would not stand up in court. Marx testified Dent told him the real reason was that Davis was "running scared" and wanted cash. This Dent denied. In any event, the signed agreements were returned by Dent to Marx, after several requests that he do so, sometime in September 1968.

Following August 28, 1968, the discussions, according to Marx, turned to cash, with Dent saying that Mayor Davis wanted $45,000. Marx countered with $30,000, which Dent subsequently said was acceptable to Davis. Marx said he could not raise $30,000 at one time, but could raise the first $15,000 within a few days. Dent de-

nied all of the foregoing, but it is an undisputed fact that on September 3, 1968, Marx borrowed $15,000 from a St. Louis bank and turned it over in $100.00 bills to Dent, who gave Marx a written receipt. The receipt did not specify the purpose of the payment. Marx testified the $15,000 was part of the bribe. Dent testified it was to enable him to employ more experienced counsel to assist him if it became necessary to file a declaratory judgment suit against the city for unreasonable refusal to issue a special use permit for an above-ground butane gas storage installation and another suit pertaining to the sewer situation. Dent also testified, however, that in telephone conversations with Marx between September 9 and 17 Marx made it plain he was expecting him to pay the money to Mayor Davis.

The $45,000 figure, according to Dent, consisted of the $15,000 above mentioned and $30,000, which Mayor Davis had told Dent would be acceptable as a cash guarantee to the city for performance by Marx if Marx went ahead with the plan of developing the subdivision by segments.

Dent took the cash to his office, put it in a metal box and it remained there intact until Dent returned the cash to Marx a few weeks later, September 21, 1968, less $3,000 which Dent retained as his fee.

On September 17, 1968, Dent met Marx at a motel in St. Louis. Dent testified that he told Marx he was through with him, that his efforts on Marx' behalf had been nullified by Mr. Marx' conduct and remarks and that if Marx thought Mayor Davis was soliciting a bribe he should go to the prosecuting attorney. Marx denied this testimony and said that Dent said Davis was looking for a scapegoat and that Dent knew another intermediary who "had enough on Davis to make it stick."

At the motel meeting, Dent said that Marx asked whom he would suggest to take Dent's place and mentioned another lawyer. Dent said he thought this lawyer would be all right and volunteered to get

in touch with him. The next day, Dent, Marx and the other lawyer met at a restaurant in St. Louis. According to Dent, Marx and the other lawyer talked but Dent visited with friends seated elsewhere in the restaurant and did not overhear the conversation. Marx testified that the other lawyer told him Mayor Davis was demanding $40,000 immediately; that Marx would have to pay it or be through in Bridgeton; and that in addition, the lawyer would have a $5,000 fee for acting as bagman.

Subsequently, as stated, Dent returned $12,000 of the $15,000 in cash, retaining $2,000 as his fee for obtaining approval by the city of the subdivision plat and an additional $1,000 for work done since the approval of the plat. Dent showed the receipt of the $3,000 fee in his office records but his records did not contain any reference to the $15,000 cash.

This was the last meeting between Marx and Dent. A few weeks later Marx went to the prosecuting attorney. Indictments were returned against Mayor Davis, Dent and two other men. The charges against Dent and the two other men were dismissed prior to trial on the ground that the three were not acting in any official capacity while allegedly performing the illegal acts. The case against Mayor Davis went to trial and was dismissed at the end of the state's case because of improper venue and failure of the state to lay the necessary foundation for certain proffered evidence and formal proof.

Mayor Davis testified before the bar committee. He denied soliciting or being offered any bribes. He said his discussions with Dent pertained to satisfaction of the city's subdivision requirements. He recalled that after the plat was approved, Dent mentioned a plan to put the land in escrow. Davis rejected it as too cumbersome. He did not recall any escrow arrangement involving $65,000 nor Dent Investment Company nor ever being presented with any option contracts.

We agree with our Special Commissioner, Judge Rogers, that this case brings into question the attitude, conduct and behavior of a comparatively young attorney of limited experience in the practice of law when offered employment by a prospective client who makes known his conviction that he needs a lawyer who can bribe city officials and who puts the question "I want to know what it takes to get the job done." Although Dent testified that he told Marx he would have no part of any payoffs, the fact is that Dent accepted employment and started negotiating with Mayor Davis. Dent admitted that as events moved along it was clear that Marx intended for Dent to pay all or part of the $15,000 cash to someone to get Marx what he wanted. Marx had been represented by another more experienced lawyer in his subdivision endeavors prior to June 15, 1968. It is unlikely that he would have switched to a new lawyer only a few months out of law school without some particular reason. That reason is found in Marx' belief that Dent was the man who could "get the job done" with Davis. It is doubtful that Marx would have retained Dent absent a willingness on Dent's part to go along with Marx' bribery intentions.

Dent's explanation of the $15,000 in cash received from Marx does not bear close scrutiny. Dent had a bank account where he deposited clients' funds received in settlement and money advanced for court costs, but he did not put the $15,000 in that account. He made no record of it in his books of account. It was in his possession for approximately 20 days in a metal box in his office. He returned $12,000 of the $15,000 in cash, but this was not until it appeared that another lawyer was about to supersede Dent in the case.

Dent's explanation that he was going to institute a declaratory judgment suit against the city and the $15,000 was to cover legal fees and engineering charges in connection therewith is not convincing. He gave no explanation as to how he ar-

rived at $15,000 as the amount needed. He did not mention to Marx what expert attorneys he was going to use. He said he contemplated a declaratory judgment suit to establish that the city was unreasonable in refusing to issue Marx a permit for construction of an above-ground LP gas distribution plant for a subsidiary of Standard Oil Company. The Zoning and Planning Commission denied the petition for a special use permit on September 9, 1968. Marx' contract on the venture had a deadline of October 1, 1968, but Dent did not explain how the proposed litigation could have been of any benefit. Dent also said he had in mind litigation over the refusal of the city to permit Marx to install his own sewer system, but did not state what his theory was on the sewer litigation.

Dent said there was no doubt the $15,000 would be deductible as legal fees. He did not think Marx would have any problem with respect to claiming a $15,000 deduction paid in cash, despite the fact that the receipt which Dent gave Marx did not indicate the money was for a deposit or for legal or engineering fees. He said he gave no thought to having Marx deposit the money in a bank as a means of guaranteeing the anticipated fees and expenses.

Dent's explanation of the option-sales contracts also does not bear close scrutiny. These contracts, on their face at least, would have provided Dent's corporation with a $63,000 profit. Dent insisted the contracts were to provide security for the city of Bridgeton for performance by Marx of the requirements laid down by the city for the subdivision but there is nothing in the record explaining how this arrangement would provide any security to the city nor anything which would bind Dent or his corporation to make the $63,000 in profit available to the city. The articles of incorporation for Dent's corporation were dated June 19, 1968. The certificate of incorporation was issued June 21, 1968. It thus appears that Dent moved swiftly to form the corporation once the option contract idea was accepted by Marx.

However, Dent testified that he had been planning all along to create his corporation, so as to have available a convenient vehicle for business purposes and that even if the Marx deal had never come along he still would have made and executed the articles on June 19. This is hard to believe. Moreover, once the option contract plan fell through, Dent did nothing with the corporation and its charter was forfeited for failure to file the annual registration report and antitrust affidavit for the following year.

Dent testified that he discussed his option contract conception with a friend of his, an officer in one of the security title companies in St. Louis which handled escrow and performance bond matters for municipalities. This officer, called as a witness by the bar committee, had no recollection of any such conversation.

One of the requirements of the city was that Marx, as developer, provide a guarantee that the work which the city would require as to streets, sewers, drainage, flood control, etc., would be completed within two years. The city engineer described the proposed subdivision plans as substandard, but even so estimated the cost of the work conservatively at $235,000. The city engineer recommended a bond or escrow arrangement in that amount. Marx disputed the accuracy of the city engineer's estimate and at various times presented his own estimates—one was $120,000, another $157,000 and a third, $168,690. Ultimately, however, Marx met the city's figure and on October 18, 1968 provided a guarantee in the amount of $235,000 through a St. Louis bank.

Nowhere does a figure of $63,000 appear as a figure which was being considered either by the council or Marx as the amount of the bond or escrow. There was testimony by Dent that he suggested that Marx develop his subdivision in segments, a lot at a time, and that this would permit a much smaller bond, but there is no evidence indicating any such proposition was made to the city. Dent conceded he did not have anything to indicate the city

would accept any figure less than $235,000. Dent testified that the city engineer endeavored to get Marx to proceed on a lot-by-lot basis with a bond agreement only for the land actually under development, but we can find no support for this in the record.

We note, too, that the various cost estimates submitted all dealt with items which would pertain to the entire subdivision, such as the sewer system, streets, and flood protection. The cost of these were substantial and could not have been avoided even if construction or development were to be limited to a "segment" at a time.

Another inconsistent aspect of the justification advanced by Dent for the option-sales contract plan is that the real estate in question was subject to a prior encumbrance, as Dent learned soon after he commenced preparation of the contract documents. This would appear to make it doubly certain that the option-sales contracts would not have been satisfactory to the city as performance security or that a title security company could have been induced to guarantee performance on the strength of these contracts.

We thus do not find convincing the explanation that the true purpose of the two option-sales contracts was not to benefit Dent or others, but was to serve as a substitute guarantee to be somehow accepted by the city or a title security company in lieu of the $235,000 bond or escrow requirement.

Aside from the testimony of Marx, there was no evidence that Dent actually offered

anyone a bribe, but certainly Marx thought that was what Dent was doing and Dent's actions bear out Marx' opinion in the respects stated. Marx had nothing to gain by fabricating a story that Dent was willing to be his go-between in working out bribes of Bridgeton officials. While the prosecuting attorney apparently decided not to prosecute Marx, who was the principal witness for the state, Marx had a good deal to lose in the way of personal and professional standing and reputation by testifying as to what he and Dent did. Marx did, as stated, lose his professional license as a result.[4]

Rule 4.47 provides in part that "A lawyer should always maintain his integrity . . . nor shall he violate his duty to the courts or his client . . . nor shall he be guilty of any other misconduct whereby, for the protection of the public and those charged with the administration of justice, he should no longer be entrusted with the duties and responsibilities belonging to the office of an attorney." Although a new rule 4 has been adopted, as earlier stated, it makes no change in the above requirements. Canon 1 of the new rule provides "A lawyer should assist in maintaining the integrity and competence of the legal profession." DR 1–102(A) provides "A lawyer shall not: . . . (4) engage in conduct involving dishonesty, fraud, deceit, or misrepresentation."

Mr. Dent was either willing for a period of time to go along with the bribery proposed by Marx or was willing to convey that impression to Marx in order to represent him for a fee. Either was in viola-

---

4. Marx testified a number of times in this case and related matters. His deposition was taken as a witness in the criminal case. He testified in the criminal case itself. He testified before the bar committee. He testified before the special commissioner. Throughout these various appearances as a witness, Marx consistently told the same story in general and was not shaken substantially despite searching cross examination. On two occasions he attempted to tape conversations between him and Dent by use of a hidden tape recorder. The tapes were not admitted in evidence either in the criminal trial or before the special commissioner, on the ground that they were not properly identified and authenticated, although Marx testified as to the substance of the conversations, which he said dealt with the $15,000 and with a demand made by Dent for another $30,000 to complete the deal with Davis. We are inclined to believe the tapes were properly identified and could have been admitted in evidence. The writer has listened to them, but there is so much of each tape which is untelligible due to background noise and other sound interference that we do not feel warranted in resorting to those portions of the tape which are understandable.

tion of his duties as a lawyer and requires disciplinary action by this court.

Our next step would ordinarily be entry of judgment on the facts found and conclusions reached in this case. However, it now develops that respondent, while the foregoing opinion was under consideration by this court, has entered a plea of guilty to an indictment pending against him in the circuit court of Franklin County, Missouri, charging him with stealing and embezzlement in violation of Sec. 560.156, RSMo 1959, V.A.M.S., and has now filed a motion requesting the court to accept his surrender of his license and right to practice law in the courts of this state.

Now therefore, said unconditional offer of Larry W. Dent to surrender his license is accepted and it is ordered that Larry W. Dent be disbarred, that his right and license to practice law in this state be cancelled and terminated unconditionally, and that his name be stricken from the roll of attorneys in this state.

All concur except BARDGETT, J., not participating.